UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

CHRISTOPHER FOTOPOLOUS,

                        Plaintiff,

          v.

THE BOARD OF FIRE COMMISSIONERS OF
THE HICKSVILLE FIRE DISTRICT,
THE HICKSVILLE FIRE DISTRICT and
THE HICKSVILLE FIRE DEPARTMENT,

                        Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
11-CV-5532 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Christopher Fotopolous commenced this action against the Board of Fire Commissioners of the Hicksville Fire District (the "Board"), the Hicksville Fire District (the "District") and the Hicksville Fire Department (the "Department"), alleging (1) hostile work environment, coerced resignation, deprivation of his property right and deprivation of his constitutional rights of freedom of speech and association, pursuant to 42 U.S.C. § 1983; (2) municipal violations pursuant to 42 U.S.C. § 1983; (3) conspiracy in violation of 42 U.S.C. § 1985; (4) conspiracy in violation of 42 U.S.C. § 1986; (5) violation of the First and Fourteenth Amendments; (6) violation of the New York Civil Service Law; and (7) intentional and negligent infliction of emotional distress. Defendants moved for summary judgment on all of Plaintiff's claims. At oral argument on January 30, 2014, Plaintiff clarified his claims as: (1) First Amendment retaliation; (2) conspiracy in violation of 42 U.S.C. § 1985; (3) conspiracy in violation of 42 U.S.C. § 1986; (4) violation of procedural due process; (5) municipal liability; (6) violation of the New York Civil Service Law § 75; and (7) intentional and negligent infliction

of emotional distress. The Court dismissed Plaintiff's procedural due process claim at oral argument. By letter dated January 31, 2014, Plaintiff withdrew his intentional and negligent infliction of emotional distress claims. (Docket Entry No. 17.) For the reasons discussed below, Defendants' motion for summary judgment is granted as to all of Plaintiff's federal law claims. The Court declines to exercise jurisdiction over Plaintiff's remaining state law claim for violation of the New York Civil Service Law § 75 and dismisses that claim without prejudice.

## I. Background

Plaintiff was employed as a dispatcher for the District, a municipal fire district organized under the laws of the State of New York, (Def. 56.1 ¶¶ 3–4; Pl. 56.1 ¶¶ 3–4), for approximately 4½ years, (*see* Fotopolous Aff. ¶ 1; Aff. of Maria Massucci ("Def. Aff.") 2). Plaintiff also served as a volunteer firefighter with the Department from 2001 until January 2011. (Fotopolous Aff. ¶ 3; Def. Aff. 3). The District had either two or three companies. (Oral Arg. Tr. 47:23–48:6.) Plaintiff was a Lieutenant, and later Captain, of Floodlight Heavy Rescue Company 8 ("Company 8"). (Fotopolous Aff. ¶¶ 8, 13.)

### a. 2009 incident involving Anthony Lentini

According to Plaintiff, in August of 2009, Anthony Lentini, one of the members of Company 8, was assaulted and knocked unconscious in the Chief's office, which resulted in Plaintiff being called to the fire station. (*Id.* ¶¶ 5–6.) Plaintiff was told that there had been underage drinking in the Chief's room and a fight broke out, causing Lentini to be knocked unconscious. (*Id.* ¶ 6.) Plaintiff took Lentini to Nassau County Medical Center. (*Id.*) The next day, "the [C]hiefs," *i.e.*, Commissioner Robert Lang, then Chief of the Department, and Chief Edward Korona, then First Assistant Chief, questioned members who were present at the time of the incident, including Plaintiff. (*Id.*)

Lentini filed assault charges with the police against Daniel Wicks and Brian Hirtzel who were members of a different company. (*Id.* ¶ 7.) According to Plaintiff, Wicks and Hirtzel were "very close" with Lang and Korona and were "part of their faction within the Fire District." (*Id.*) Wicks was a "good friend" of Lang's and Hirtzel is Korona's brother-in-law. (*Id.* ¶ 9.) When Lang and Korona found out that Lentini reported the fight incident to the police, "they became outraged and suspended every Company 8 member that was present in the room when Lentini was assaulted." (*Id.* ¶ 8.) The only individuals suspended were Company 8 members. (*Id.*) Members of the other companies who were associated with Lang and present for the incident were not suspended. (*Id.*) Plaintiff was not suspended at that time. (*Id.* ¶ 22.)

After this incident, Plaintiff was "very persistent with the Chiefs[,] demanding that [his] members be reinstated as firefighters and also demanding Wicks and Hirtzel be expelled from the Fire Department." (*Id.* ¶ 10.) Lang refused to answer Plaintiff's letters regarding Company 8 members being reinstated to duty. (*Id.*) Lang and Korona "suddenly began denying training classes and other requests" from Plaintiff. (*Id.*) They also "made up their own rules about how the hearing process would work[,] disregarding all District and Department by[-]laws." (*Id.*)

**b. December 2009 fire commissioner election and subsequent changes**

In December 2009, Lang was a candidate in the election for fire commissioner to commence at the conclusion of his term as Chief of the Department.[1] (*Id.* ¶ 11; Docket Entry

---

[1] In the parties' summary judgment papers and affidavits in support thereof, they described the fire commissioner election in which Lang defeated Harry J. Single, Jr., as a "2010" fire commissioner election. By order dated March 24, 2014, the Court directed the parties to clarify the date of the election. (Order dated Mar. 24, 2014.) By letter dated March 27, 2014, Defendants advised the Court that the election occurred on December 8, 2009, (Docket Entry No. 20), and Plaintiff confirmed this date by letter dated March 28, 2014, noting that Lang was sworn in to office in January 2010, (Docket Entry No. 21). For clarity, the Court notes that Plaintiff describes the December 8, 2009 election for the 2010 fire commissioner position as the

No. 20.) According to Plaintiff, Elizabeth Flahavan, a member of Company 8 who was also "part of [Lang's] faction," was a "key campaign person" for Lang. (Fotopolous Aff. ¶ 12.) Plaintiff did not support Lang for fire commissioner and "it was made clear to [Plaintiff] that it would cost [him] [his] career with the District." (*Id.* ¶ 12.) Plaintiff instead supported Harry J. Single, Jr., Lang's opponent. (*Id.* ¶ 14.) On December 8, 2009, Lang was elected Fire Commissioner, Korona was elected Chief of the Department, Plaintiff was elected Captain of Company 8 and Flahavan was elected First Lieutenant of Company 8. (*Id.* ¶ 13; Docket Entry No. 20.) Lang became one of Plaintiff's direct supervisors in his role as Commissioner. (Fotopolous Aff. ¶ 15.)

According to Plaintiff, Lang "used his political influence and power within the Fire District to punish [Plaintiff] and anyone in [Plaintiff's] company who did not support [Lang], his faction or his actions." (*Id.*) Throughout 2010, Lang and Korona "took numerous actions against" Plaintiff in his employment as a dispatcher and his role as a volunteer firefighter, including "isolating [Plaintiff] from the other Companies and Volunteer Firefighters by enforcing new policies that no Volunteer firefighters were to enter [Plaintiff's] work station during [his] shifts as a dispatcher." (*Id.* ¶ 16.) For example, prior to December 2009, during Plaintiff's work hours from 7:00 p.m. to 7:00 a.m. on Tuesday nights, members of Company 8 would conduct trainings or familiarize themselves with the equipment, and would have dinner with Plaintiff at the firehouse. (*Id.* ¶ 17.) After Lang became the Commissioner, he prohibited them from doing so. (*Id.*) Plaintiff claims that the door to the dispatcher's office had always been kept open, but Lang and Korona required that Plaintiff keep the door closed at all times and not allow visitors into the office. (*Id.*) Plaintiff contends that his "every move was watched by

"2010 election," and the December 2010 election for 2011 Company 8 officers as the "2011 Company elections." (*See* Fotopolous Aff. ¶ 41.)

the Department, including where [he] parked." (*Id.* ¶ 18.)  After parking in the same spot throughout his tenure at the District, Plaintiff, in 2010, received a letter stating that he must park in certain designated spots.  (*Id.*)  The letter also stated that Plaintiff had been warned on numerous prior occasions in this regard, but Plaintiff contends that he never received such prior warnings or discipline.  (*Id.*)

In his volunteer firefighter capacity, Plaintiff received letters stating that he could "no longer open the bay doors unless there was an alarm." (*Id.* ¶ 19.)  In addition, members were not allowed to eat meals on the truck room floor, and the work bench where Company 8 worked on their tools and equipment had to be moved to a different, inconvenient location in the firehouse. (*Id.*)  Company 8 was told that they could no longer "go on mutual aid calls to neighboring departments when called for."  (*Id.*)  Plaintiff claims that the policies only applied to members of Company 8, *i.e.*, "those not associated with [Lang] and [Korona]."  (*Id.*)  He asserts that "[a]ll things that Company 8 [had] been doing for years now were being taken away or changed to spite Plaintiff and those who did not support Korona and Commissioner Lang," and "none of these changes were implemented in other companies who were associated with and supported Chief Korona's and Commissioner Lang's faction."  (*Id.*)  Plaintiff questioned Lang and Korona's actions during meetings and was told that "they were in charge and they had a right to unilaterally make any changes they wanted."  (*Id.*)

### c. December 2010 elections and Plaintiff's suspension

In December 2010, elections were held for Company 8 Officers.  (*Id.* ¶ 20.)  According to Plaintiff, a week before the election, Company 8 received a letter from Korona stating that four members of Company 8 could not vote in the upcoming election because they were on "percentage probation."  (*Id.* ¶ 21; Fotopolous Ex. B.)  These individuals were either present or witnessed the 2009 incident involving the assault of Lentini.  (Fotopolous Aff. ¶ 21.)  Plaintiff

and Company 8 members reviewed the by-laws and concluded that their exclusion from voting violated the by-laws.  (*Id.*)  Company 8 members voted overwhelmingly in favor of disregarding Korona's letter and following the by-laws.  (*Id.*)  In the election, Flahavan was challenged for her First Lieutenant position by William Tolley, and Tolley won the First Lieutenant election with a majority of the votes.  (*Id.*)

Plaintiff claims that on January 3, 2011, he was called into a meeting in Korona's office with Korona, Flahavan, First Assistant Chief Christopher Moskos, Second Assistant Chief Frank McGeough and Third Assistant Chief Richard Diaz.  (*Id.* ¶ 22.)  Plaintiff was told that he "would be terminated if [he] refused to hold another Company election."  (*Id.*)  Plaintiff "did not hold another election and . . . stood by the results of the elections which were dutifully held."  (*Id.*)  Plaintiff was then "suspended for allegedly refusing to follow . . . direct orders and hold another election."  (*Id.*)  A January 3, 2011 letter from Moskos to Plaintiff, titled "Re: Disciplinary Action and Charges," informed Plaintiff that as of January 3, 2011, he was relieved of his duties as a volunteer firefighter for violation of Department by-laws.  (Fotopolous Ex. C.)  The letter advises that a hearing date would be scheduled and formal charges delivered by mail.  (*Id.*)  The letter makes no reference to Plaintiff's paid position as a dispatcher for the District.  (*Id.*)

According to Plaintiff, on January 4, 2011, "the Chiefs" called a "special By-Law Committee meeting" to address whether it was a violation of the by-laws to allow members who were on "percentage probation" to vote in the elections.  (Fotopolous Aff. ¶ 23.)  The by-law committee held that it would be a violation of the by-laws to exclude a member from voting. (*Id.*)  However, a January 15, 2011 letter from Chief Korona to Company 8 informed Company 8 that after an inquiry, the Chiefs' office determined "through advi[c]e of the bylaw committee" that the members on percentage probation should not have had the right to vote.  (Fotopolous

Ex. E.)  Korona's statement is contradicted by an affidavit submitted by Plaintiff of a former

Department captain, Roger Koopmann, who attended the meeting and states that the committee

did not find that Plaintiff violated the by-laws by allowing members who were on "percentage

probation" to vote.  (Pl. Ex. D ("Koopmann Aff.").)

### d.  Plaintiff's resignation

Plaintiff claims that, on January 12, 2011 at 7:00 a.m., after working a night shift, he was

called to a meeting in the board room with District Superintendent Thomas Sullivan.

(Fotopolous Aff. ¶ 24.)  Sullivan informed Plaintiff that the Board wanted him to resign from his

paid dispatcher position and his volunteer firefighter position because he was "signing [his]

friends in for fire calls."[2]  (*Id.* ¶ 25.)  Plaintiff "was shocked and confused and did not understand

why this was problematic" and then was "informed that [he] would be arrested, [] would never

work again and would be prosecuted for allegedly signing in [his] friends for calls."  (*Id.*)

Sullivan told him "that the only option [Plaintiff] had was either to sign the resignation letters or

lose everything, including any of [his] benefits and . . . [his] ability to ever get another job

again."  (*Id.*)  When Plaintiff asked Sullivan for proof and for an explanation as to why this was

happening, Sullivan told him that the documents were at Lang's house, and said, "[u]nfortunately

people have it out for [you]."  (*Id.* ¶ 26.)  Plaintiff protested that dispatchers' duties included

signing "members in for Fire/EMS calls," but Sullivan told Plaintiff that "if [Plaintiff] did not

sign the papers that [he] would be arrested, they would ruin [his] life and [he] would never get

---

[2]  The District and Department participate in Length of Service Award Programs
("LOSAP") pursuant to General Municipal Law § 217, which provides "pension-type" benefits
to volunteer firefighters.  (Def. Aff. 3.)  Firefighters are required to earn a specified number of
points to qualify for the LOSAP benefits, and the points are earned by responding to and/or
being on standby for emergency calls.  (*Id.*)  Records are kept of the names of volunteer
firefighters who respond to emergency calls.  (*Id.* (citing Def. Ex. B ("Lang Aff."), C ("Mening
Aff."), F ("Emergency Call Sheets")).)  Defendants accuse Plaintiff of improperly signing in his
friends "for fire calls" so that they could earn LOSAP points.

another job again." (*Id.*) Plaintiff asked for time to think it over, but Sullivan told him that he could not leave until the paperwork was signed. (*Id.*) Plaintiff "kept thinking of [his] children and how [he] was going to support them," and "felt threatened, coerced and . . . left with no other option but to sign the resignations." (*Id.* ¶ 27.) Plaintiff was never told that he should resign because he was signing *himself* in for volunteer calls while on duty as a dispatcher. (*Id.* ¶ 30.) Plaintiff denies ever signing himself in for volunteer calls while on duty as a dispatcher. (*Id.*)

### e. Attempts to rescind resignation

An hour after Plaintiff signed the resignation letters he returned to the firehouse "because [he] realized how preposterous it sounded that [he] would be arrested for performing [his] duties." (*Id.* ¶ 28.) Plaintiff told Sullivan that he wished to withdraw his resignation letters, but Sullivan told Plaintiff that "the Commissioners already accepted [his] letter of resignation, even though no Board meeting [had been] held." (*Id.*) Plaintiff "felt harassed" and that "irrespective of what [he] did, the Chief's Group [was] looking to terminate [his] employment." (*Id.* ¶ 31.) Later that day he sent a registered letter to the Board stating that he wished to withdraw his "apparent resignation." (*Id.* ¶ 29.) On January 14, 2011, unsure of whether he should report to work for his Sunday shift, Plaintiff sent another registered letter requesting a meeting. (*Id.*) Plaintiff never received an answer to either letter. (*Id.*) Plaintiff called the Chairman of the Board and "asked him what was going on," but was told that the Chairman did not know of Plaintiff's resignation and was unaware of the situation. (*Id.*)

### f. Time logs and LOSAP

According to Defendants, Plaintiff resigned his position when he was confronted with evidence of misconduct. (Def. Mem. 8.) As an employee of the District, Plaintiff signed weekly time sheets or logs recording the hours he worked as a dispatcher and was paid for the hours

represented on the time sheets.  (Def. Aff. 2 (citing Def. Ex. D ("Time Logs")).)  As a volunteer

firefighter, Plaintiff was qualified to potentially receive Length of Service Award Programs

("LOSAP") benefits upon earning the required points.  (*Id.* at 3; note 2 *supra.*)  Defendants claim

that Plaintiff entered himself as a volunteer responder on several emergency calls at the same

time that he was working as a dispatcher for the District.  (Def. Aff. 3 (citing Time Logs and

Emergency Call Sheets).)  By doing so, Plaintiff violated General Municipal Law § 217(f) and

§ 219-s, and his actions are punishable under the Penal Code § 175.05 or § 175.10 for falsifying

business records, § 175.20 or § 175.25 for tampering with public records, and § 176.05 for

insurance fraud.  (*Id.* at 3–4.)  According to Defendants, when Plaintiff was confronted with the

findings of his employment hours and call response times, he resigned from his paid position

with the District as a dispatcher and from his position as a volunteer member of the Department.

(*Id.* at 4–5 (citing Def. Exs. G ("District Resignation Letter") and H ("Department Resignation

Letter")).)

   Plaintiff disputes that he engaged in misconduct or that he needed LOSAP points.

Plaintiff asserts that when the Department receives a call for any type of emergency, the

dispatcher on duty is responsible for signing in members who respond to the emergency.

(Fotopolous Aff. ¶ 32.)  In addition, to fulfill the LOSAP obligations, a volunteer firefighter only

needs 25 points each year, which are accumulated through a variety of activities.[3]  (*Id.* ¶ 35.)

Plaintiff claims that he met his LOSAP requirements just from attending trainings, meetings,

_____

   [3]  "[M]embers can have a combination of 7.5% of the calls they respond to be fire calls
and rescue calls," and they also receive credit for meetings, drills, parades, trainings, etc.
(Fotopolous Aff. ¶ 35.)  Because Plaintiff was a volunteer firefighter with five to ten years of
service, he "was required to respond to only twenty (20) percent of the total number of calls that
came in to the Fire Department to achieve [his] Department percentage."  (*Id.* ¶ 36.)  In 2010, the
Department received 941 Fire Calls and 431 Rescue calls, and Plaintiff "made a total of 394
calls," well in excess of the 275 required of him.  (*Id.*)

events and his positions as Captain and Secretary.  (*Id.* ¶ 37.)  According to Plaintiff, even without the twenty calls that Defendants accuse him of improperly signing in for, he had in excess of the 25 points he needed for LOSAP.  (*Id.* ¶ 38.)  He had no motive to fraudulently sign himself in for calls, and denies doing so.  (*Id.* ¶¶ 30, 38.)  Plaintiff also argues that "manual sign in can be performed by anyone who has access to the software program on any computer in any of the four Fire Stations."  (*Id.* ¶ 33.)  The disputed calls that he allegedly signed himself in for were manually inputted, and could have been orchestrated by Korona and Lang in order to get rid of Plaintiff because he did not support their "political endeavors."  (*Id.* ¶ 39.)

Following Plaintiff's resignation, Flahavan took over Plaintiff's position as Captain of Company 8, and Wicks and Hirtzel, the individuals accused in the 2009 assault of Lentini, were reassigned to the Department without negative repercussions.  (*Id.* ¶ 40.)

Plaintiff claims that he was retaliated against for failing to support Korona, Lang and Flahavan in elections, and that Defendants' conduct has caused him "severe emotional distress, mental anguish, physical injury, anxiety and depression that persist to date, as a result of [his] wrongful termination."  (*Id.* ¶ 41.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, --- F. App'x ---, ---, 2014 WL 943933, at *1 (2d Cir. Mar. 12, 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  The role of the

court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has cautioned that '[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b. First Amendment retaliation claim

Plaintiff alleges that Defendants violated his First Amendment rights to freedom of speech and association by retaliating against him for refusing to associate with a political faction within the District, which ultimately resulted in his coerced resignation. (Pl. Opp'n 1.)

As the Supreme Court has made clear, public employees do not surrender their First Amendment rights to comment on matters of public interest because of their employment. *See Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) ("[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of

public concern." (citations omitted)); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968) (noting that the Supreme Court has "unequivocally rejected" the notion that "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work"); *see also Wrobel v. Cnty. of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) ("Public employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment." (citations omitted)). "The First Amendment right extends to associational conduct, including the decision not to support or affiliate with a political party or faction." *Wrobel*, 692 F.3d at 27.

"To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Puglisi v. Town of Hempstead, Dep't of Sanitation, Sanitary Dist. No. 2*, 545 F. App'x 23, 26 (2d Cir. Oct. 18, 2013) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)); *see also Adams v. Ellis*, 536 F. App'x 144, 144 (2d Cir. 2013); *Wrobel*, 692 F.3d at 27; *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008). "[T]he First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if 'the employee sp[eaks] [1] as a citizen [2] on a matter of public concern.'" *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (alterations in original) (quoting *Garcetti*, 547 U.S. at 418); *see also Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that . . . the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest . . . ."

(citation and internal quotation marks omitted)); *Spencer v. Philemy*, 540 F. App'x 69, 70 (2d Cir. 2013) ("[T]he First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if 'the employee sp[eaks] [1] as a citizen [2] on a matter of public concern.'" (alterations in original) (quoting *Singer*, 711 F.3d at 339)). The Second Circuit has held that the "public concern" requirement applies to associational conduct in addition to speech. *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004).

"A matter of public concern is one that relates to any matter of political, social, or other concern to the community." *Spencer*, 540 F. App'x at 70 (alteration and internal quotation marks omitted) (quoting *Singer*, 711 F.3d at 339). Speech made pursuant to an employee's duties and responsibilities is not protected speech. *See Garcetti*, 547 U.S. at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); *see also Monz v. Rocky Point Fire Dist.*, 519 F. App'x 724, 727 (2d Cir. 2013) (expressions made pursuant to employee's official duties as captain of fire company were not constitutionally protected).

To determine whether speech is a matter of public concern the Court must look at the entire record and take into consideration the "content, form, and context" of the speech. *See Singer*, 711 F.3d at 339 ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983))); *Spencer*, 540 F. App'x at 70 (same); *see also Adams*, 536 F. App'x at 145 ("Whether speech is a matter of public concern is . . . determined by the 'content, form and context of a given statement, as revealed by the whole record.'" (quoting *Connick*, 461 U.S. at 147–48 & n.7)).

The Court must also examine whether the speech addresses a personal grievance or has a public purpose. *Spencer*, 540 F. App'x at 70 ("Among the relevant considerations is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." (quoting *Singer*, 711 F.3d at 339)); *see also MacFall v. City of Rochester*, 495 F. App'x 158, 160–61 (2d Cir. 2012) (stating that speech is not protected if it is "merely 'calculated to redress personal grievances'" (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008))). Although the Court can consider the employee's motive, any such motive is not dispositive of the issue. *Spencer*, 540 F. App'x at 70 ("The employee's motive for speaking 'surely may be one factor' in determining whether the speech was on a matter of public concern, but motive 'is not, standing alone, dispositive or conclusive.'" (quoting *Sousa v. Roque*, 578 F.3d 164, 175 (2d Cir. 2009))). "The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern." *Jackler v. Byrne*, 658 F.3d 225, 235–36 (2d Cir. 2011) (citations omitted). The question of whether a public employee spoke on a matter of public concern is a question of law. *Id.* (citing *Singer*, 711 F.3d at 339).

As with the right to freedom of speech, "[t]he right to free association is 'a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.'" *State Emp. Bargaining Agent Coal. v. Rowland* ("*Rowland*"), 718 F.3d 126, 132 (2d Cir. 2013) (quoting *Shelton v. Tucker*, 364 U.S. 479, 485–86 (1960)), *cert. denied*, 571 U.S. ---, 134 S. Ct. 1002 (2014). "[G]overnment employers may not 'condition hiring decisions on political belief and association . . . unless the government has a vital interest in doing so.'" *Rowland*, 718 F.3d at 132 (quoting *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 78 (1990)); *see also Wrobel v. Cnty. of Erie*, 211 F. App'x 71, 72 (2d Cir. 2007) ("Government employees who are not policymakers have the right not to affiliate with or support a particular

party or faction as a condition of employment." (citing *Rutan*, 497 U.S. at 69)).

To establish a First Amendment claim based on associational conduct, "the plaintiff must demonstrate by a preponderance of the evidence that the conduct at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected conduct and the adverse employment action." *Matusick v. Erie Cnty. Water Auth.*, --- F.3d ---, ---, 2014 WL 700718, at *10 (2d Cir. Feb. 25, 2014) (alteration and citation omitted); *see also Bearss v. Wilton*, 445 F. App'x 400, 404 (2d Cir. 2011) ("To establish a First Amendment retaliation claim for political association, the plaintiff must show that she engaged in political association and that such conduct was the cause of defendants' retaliatory action." (citing *Brady v. Town of Colchester*, 863 F.2d 205, 217 (2d Cir. 1988))).

These First Amendment protections have "been extended to politically neutral employees who are treated less favorably than employees politically aligned with those in power, as well as to employees who suffer because of their political support of a losing faction of the party in power." *Wrobel*, 692 F.3d at 28 (citing *Welch v. Ciampa*, 542 F.3d 927, 939 & n.3 (1st Cir. 2008); *Gann v. Cline*, 519 F.3d 1090, 1095 (10th Cir. 2008); *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 273 (3d Cir. 2007); and *McCloud v. Testa*, 97 F.3d 1536, 1551 (6th Cir. 1996)). However, "[o]nly if an employee's speech or associational conduct 'touches on a matter of public concern' can a First Amendment claim proceed." *Wrobel*, 692 F.3d at 28 (quoting *Cobb*, 363 F.3d at 102).

The Second Circuit has held that where a public employee does "not pledg[e] his support for [a] [new] administration and cho[oses] not to affiliate himself politically with it," retaliation for such conduct, if adequately proven, could give rise to Section 1983 liability. *Id.* (internal quotation marks omitted) (citing *Wrobel*, 211 F. App'x at 72). The record must show that a

political association exists, *id.* at 29, and a Plaintiff must present "evidence or available inference that [the] distinction is political in the sense that it relates to any political, social, or other community concern," *id.* at 28.

However, "[e]ven if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." *Puglisi*, 545 F. App'x at 26 (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011)).

Plaintiff claims that he engaged in protected speech and associational conduct by opposing underage drinking in the firehouse, opposing Lang, and refusing to hold a second election in January 2011, and that Defendants retaliated against him by suspending him and coercing his resignation as a result. Defendants argue that Plaintiff did not engage in protected speech or conduct, and that Plaintiff resigned of his own volition when faced with evidence of misconduct.

While the Court finds that speech about underage drinking in the firehouse addresses a matter of public concern, and is therefore protected, Plaintiff has failed to adduce sufficient evidence upon which a jury could find that he engaged in such protected speech. Furthermore, even assuming *arguendo* that Plaintiff made statements about underage drinking in the firehouse, he has failed to demonstrate a causal connection between this speech and the adverse employment actions he suffered. Lastly, the Court finds, as a matter of law, that Plaintiff's speech and associational conduct relating to the Department's elections and "political factions" does not constitute protected activity.

### i. Protected speech or associational conduct

Plaintiff argues that his protected speech and associational conduct are his (1) speaking

out in 2009 about underage drinking in the firehouse (Pl. Opp'n 20), (2) opposition to Lang in the December 2009 election, (*id.* at 11), and (3) refusal to hold a second election in January 2011.[4]

### 1. Speaking out about underage drinking

Plaintiff argues that he engaged in protected speech in 2009 when he spoke out against underage drinking in the firehouse,[5] and later in 2009, when he engaged in a letter writing campaign opposing Lang's candidacy for fire commissioner based on Lang's decision to "rehire those individuals involved in assaulting Lentini." (Pl. Opp'n 20; Docket Entry No. 20.) Other than Plaintiff's testimony that he did these things, there is no evidence before the Court that Plaintiff did speak out about underage drinking in the firehouse.

An underage drinking problem in the firehouse is a matter of public concern. *See Monz*, 853 F. Supp. 2d at 727. In *Monz*, a case factually similar to this case, the plaintiff Monz was a volunteer firefighter in the Rocky Point Fire District who was barred from reinstatement after he spoke out about limiting drinking in the firehouses. The plaintiff in *Monz* publicly "expressed his dismay with the extent of drinking occurring in the firehouses" in the Rocky Point Fire District at a commissioner's meeting and "successfully lobbied for changes to the hours

---

[4] Plaintiff initially argued that he engaged in protected speech when (1) in 2009 he made several statements and issued several letters regarding the unlawful suspension of Lentini, (Pl. Opp'n 20), and (2) he vocalized his concerns that his members were being discriminated against because of their failure to support Lang, (*id.*), but conceded at oral argument that he could not sustain his burden as to either of these claims since they were both made by Plaintiff while carrying out his duties and responsibilities as Captain of Company 8 to advocate on behalf of the members of his company. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

[5] Defendants conceded at oral argument that to the extent Plaintiff can show that he did speak out about underage drinking in the Department, such speech was on a matter of public concern and therefore protected.

volunteer firefighters could consume alcoholic beverages on site." *Monz*, 519 F. App'x at 726. The Second Circuit affirmed the district court's determination that Monz's speech about the alcohol policy at the commissioner's meeting was a matter of public concern. *Id.* at 727.

Here, Plaintiff claims that he attempted to "shed light" on the underage drinking issue "to the community" and sent a letter to that effect. (Pl. Opp'n 20.) However, despite claiming to have sent this letter, Plaintiff fails to identify to whom the letter was sent or describe the letter's contents. Indeed, other than his own conclusory assertion about sending the letter, Plaintiff offers no proof that such a letter was sent. Even drawing all inferences in Plaintiff's favor, as the Court is required to do, and recognizing that underage drinking in a firehouse would be of concern to the public, *see Monz*, 519 F. App'x at 727, the Court finds that Plaintiff has failed to produce sufficient evidence upon which a jury could find that he sent a letter about underage drinking in the firehouse or that Plaintiff engaged in protected speech on this topic.

### 2. Associational conduct opposing Lang

Plaintiff argues that his "right to freely associate" was infringed by Defendants, (Pl. Opp'n 11), because Lang "used his political influence and power within the Fire District to punish [Plaintiff] and anyone in [Plaintiff's] company who did not support [Lang], his faction or his actions." (Fotopolous Aff. ¶ 15.) Plaintiff supported Single, Lang's opponent, in the election for Fire Commissioner. (Tr. 15:24–16:3.)

To establish a First Amendment claim based on associational conduct, "the plaintiff must demonstrate by a preponderance of the evidence that the conduct at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected conduct and the adverse employment action." *Matusick*, --- F.3d at ---, 2014 WL 700718, at *10 (alteration and citation omitted).

There is no evidence in the record to support Plaintiff's argument that there was a political faction within the District, or that Plaintiff opposed this political faction which resulted in Lang and Korona taking adverse actions against him. Plaintiff testified that he opposed Lang and supported Lang's opponent in the race for Fire Commissioner. (Fotopolous Aff. ¶ 14.) Plaintiff claims that he was punished for his unwillingness to support Lang, along with anyone in his Company "who did not support [Lang], his faction or his actions." (*Id.* ¶ 15.) However, distinction based on a political association must be "political in the sense that it relates to any political, social, or other community concern." *Wrobel*, 692 F.3d at 28–29. Plaintiff's opposition to Lang does not relate to a public matter, but to an employment-related, *i.e.*, personal grievance. At most, the evidence shows that Plaintiff and his cohorts, some of the members of Company 8, were not friendly or closely associated with Lang and some of his cohorts, and that because Plaintiff supported Lang's opponent and Lang won the election, Lang, as the new boss, took certain measures against Plaintiff and his group. Plaintiff has failed to show that by opposing Lang, he and his group of friends in the Department were doing anything more than opposing an individual they disliked for personal reasons. *Cf. Connick*, 461 U.S. at 147 ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."); *Spencer*, 540 F. App'x at 70 (in the speech context, the Court must consider "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose" (quoting *Singer*, 711 F.3d at 339)); *see also MacFall v. City of Rochester*, 495 F. App'x 158, 160–61 (2d Cir. 2012) (stating that speech is not protected if it is "merely 'calculated to redress personal grievances'"

(quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008))).  Thus, Plaintiff did not

engage in associational conduct protected by the First Amendment.

### 3.  January 2011 refusal to hold new election

Plaintiff argues that he engaged in additional First Amendment protected conduct when

in January 2011, he refused to hold a new election for Company 8 officers that would have

barred four of the members of Company 8 from voting.  Those members were on probation at the

time of the election, and Plaintiff was instructed by Korona that they were not permitted to vote.

(Fotopolous Aff. ¶ 21.)  Plaintiff believed that allowing them to vote while on probation was

consistent with the relevant by-laws.  (*Id.*)  After the election, Plaintiff was instructed to hold a

new election, and Plaintiff refused.  (*Id.* ¶ 22.)  Plaintiff claims that holding a new election would

have "ensure[d] that Flahavan would win," and Flahavan was a Company 8 member aligned with

Lang and Korona.  (*Id.* ¶¶ 20, 22.)

Any statements or conduct by Plaintiff in support of the members of Company 8 and their

right to vote would have been made pursuant to Plaintiff's official duties as then-Captain of

Company 8.  *See Garcetti*, 547 U.S. at 421 ("[W]hen public employees make statements

pursuant to their official duties, the employees are not speaking as citizens for First Amendment

purposes, and the Constitution does not insulate their communications from employer

discipline.").  Plaintiff has not shown how this disagreement over internal policies and

procedures bears on a matter of public concern.  "[A] public employee bringing a First

Amendment freedom of association claim must persuade a court that the associational conduct at

issue touches on a matter of public concern."  *Cobb*, 363 F.3d at 102; *cf. Jackler*, 658 F.3d at 236

("Exposure of official misconduct, especially within the police department, is generally of great

consequence to the public." (citation omitted)); *Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir.

2006) ("We view concerns raised to the government about the lawfulness of public officials' actions as implicating a matter of public interest . . . ." (citation omitted)); *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003) (holding the plaintiff's speech which criticized the police department's approach "to fighting organized crime, its resistance to change, and its systemic racism and anti-Semitism" was a matter of public interest); *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 265 (S.D.N.Y. 2006) ("Speech relating to public corruption and/or a public entity's failure to adequately or properly investigate such corruption lies comfortably within the[] categories of protected expression.")).  There is no reason to believe the public would be concerned about which firefighter holds what office in an internal Company or faction.[6]  Thus, as a matter of law, Plaintiff cannot show that by refusing to hold a new election for Company 8 officers, he engaged in associational conduct that is protected by the First Amendment.

### ii.    Adverse action

In addition to proving that he engaged in protected speech or associational conduct, which Plaintiff failed to do here, Plaintiff must demonstrate that he suffered an adverse action. Plaintiff argues that he suffered an adverse action when he was suspended from his volunteer position on January 3, 2011, and when he was coerced to resign from both his volunteer firefighter position and his paid dispatcher position on January 12, 2011.  Defendants argue that Plaintiff's resignation was not coerced; rather Defendants had a right to fire him, and Plaintiff voluntarily resigned when confronted with evidence of wrongdoing.

To establish an adverse action for purposes of a First Amendment retaliation claim a

---

[6] There is no evidence before the Court that the election for Company 8 officers involved any political, social or other community concern or was anything other than an internal ordering of Company 8 leadership.

plaintiff must show "conduct that would deter a similarly situated individual of ordinary firmness from exercising [his] constitutional rights." *Smith v. Levine*, 510 F. App'x 17, 21 (2d Cir. 2013) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)); *see also Ford v. Palmer*, 539 F. App'x 5, 6 (2d Cir. 2013) ("Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of [First Amendment] retaliation." (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002))). In the First Amendment retaliation context, "[a]dverse employment actions include discharge, demotion, refusal to hire, refusal to promote, and reprimand." *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995) (citation omitted); *see also Wrobel*, 692 F.3d at 31 (stating that in the First Amendment retaliation context "[t]he list of adverse actions has included harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand").

As discussed below, a reasonable jury could find that Plaintiff's suspension and coerced resignation constituted adverse employment actions.

### 1. Suspension

Plaintiff was suspended from his unpaid, volunteer firefighter position with the Department for refusing to follow direct orders to hold a new election for Company 8 officers. (Fotopolous Aff. ¶ 22; Fotopolous Ex. C.) Plaintiff was notified by letter of the "[d]isciplinary [a]ction and [c]harges" and informed that a hearing date would be scheduled and formal charges delivered by mail.[7] (Fotopolous Ex. C.) The Second Circuit has held in the First Amendment

---

[7] It is unclear from the record whether the hearing contemplated was a New York Civil Service Law § 75 proceeding, however it may be inferred that it was, as Defendants have not disputed Plaintiff's contention that Plaintiff is protected by the provisions of New York Civil

retaliation context that "the initiation of disciplinary charges leading to an administrative hearing permitting 'suspension with pay and carrying with it the threat of possible termination' constitutes adverse employment action." *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 47 (2d Cir. 2012) (alteration omitted) (quoting *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 313–314 (2d Cir. 2005)), *cert. denied*, 568 U.S. ---, 133 S. Ct. 527 (2012); *see also Burkybile*, 411 F.3d at 313–14 (holding in the First Amendment retaliation context that the threat of a Section 3020-a hearing, which hearing permits suspension with pay and carries with it the threat of possible termination, is a deterrent for a person of ordinary firmness, and therefore "disagree[ing] with the district court's conclusion that the filing of the administrative charges, and the resulting suspension, could not, as a matter of law, constitute an adverse employment action"); *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 n.8 (2d Cir. 1987) ("In the event . . . that appellees were motivated by retaliatory animus in instituting the Section 75 proceeding, Title VII would be violated even though there were objectively valid grounds for the proceeding and the resulting discharge."); *but see Monz*, 519 F. App'x at 726 (assuming, without deciding, that a volunteer firefighter position "is a government benefit for purposes of a First Amendment retaliation claim" where the district court and the parties presumed that the fire commissioner's refusal to reinstate the plaintiff as a volunteer firefighter qualified as an adverse employment action, but acknowledging that a recent New York Court of Appeals decision determining that "a volunteer fire corporation is not a specified public entity within the meaning of the prevailing wage requirement of Labor Law § 220 . . . may counsel otherwise" (citing *M.G.M. Insulation,*

---

Service Law § 75 (which require such a hearing for disciplinary actions), nor have Defendants suggested that the § 75 protections apply only to Plaintiff's paid dispatcher position and not to his volunteer firefighter position. In any event, the initiation of disciplinary charges leading to an administrative hearing would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights, whether initiated pursuant to § 75 or otherwise.

*Inc. v. Gardner*, 962 N.Y.S.2d 600 (2013)). The record does not reflect what repercussions Plaintiff could face as a result of the disciplinary charges and hearing initiated against him. However, a reasonable jury could find that Plaintiff's suspension and the initiation of disciplinary charges and an administrative hearing against him constituted an adverse employment action.

### 2. Coerced resignation

Plaintiff's claim that he was coerced to resign can be considered a claim of constructive discharge, and therefore satisfies the adverse action requirement for Plaintiff's First Amendment retaliation claim. A *constructive* discharge occurs when an employer "intentionally create[s] an intolerable work atmosphere that force[s the plaintiff] to quit involuntarily." *Andersen v. Rochester City Sch. Dist.*, 481 F. App'x 628, 632 (2d Cir. 2012) (evaluating claim for constructive discharge in violation of Title VII, the NYSHRL and the First Amendment (quoting *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 185 (2d Cir. 2011))), *cert. denied*, 568 U.S. ---, 133 S. Ct. 836 (2013); *see also Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp. 2d ---, ---, 2013 WL 4432354, at *7–9 (E.D.N.Y. Aug. 14, 2013) (evaluating claim for constructive discharge in violation of Title VII and NYSHRL); *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 214 (E.D.N.Y. 2013) (evaluating claim for constructive discharge in violation of Title VII).[8]

In order to establish a claim for constructive discharge, it is not enough for a plaintiff to

---

[8] Courts evaluating First Amendment retaliation claims for constructive discharge regularly rely on constructive discharge analyses in employment discrimination case law. *See, e.g.*, *Andersen v. Rochester City Sch. Dist.*, 481 F. App'x 628, 632 (2d Cir. 2012), *cert. denied*, 568 U.S. ---, 133 S. Ct. 836 (2013); *Stokes v. City of Mount Vernon, N.Y.*, No. 11-CV-7675, 2012 WL 3536461, at *7–8 (S.D.N.Y. Aug. 14, 2012), *reconsideration granted in part on other grounds*, 2012 WL 6691078 (S.D.N.Y. Dec. 17, 2012); *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 270–72 (E.D.N.Y. 2012); *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at *3–5 (S.D.N.Y. Aug. 5, 2009).

resign instead of facing potential disciplinary charges. *Bailey v. N.Y.C. Bd. of Educ.*, 536 F. Supp. 2d 259, 266 (E.D.N.Y. 2007). Nor is it enough for a plaintiff to fear termination. *Massie v. Ikon Office Solutions. Inc.*, 381 F. Supp. 2d 91, 96–100 (N.D.N.Y. 2005) (holding that "fear of being terminated [was] not an adverse employment action because of its lack of consequence"). However, threats of termination may be sufficient to establish a constructive discharge claim. *Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 324 (D. Conn. 2004) (finding that "threats of termination alone are sometimes sufficient to show constructive discharge" (citing *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987))); *see also Chertkova v. Conn. Life Ins. Co.*, 92 F.3d 81, 89–90 (2d Cir. 1996) ("In *Lopez*, we held that telling plaintiff he would be fired following probation, 'no matter what he did to improve his allegedly deficient performance,' was sufficient alone to support a finding of constructive discharge." (quoting *Lopez*, 831 F.2d at 1188)).

To determine whether threats of termination are sufficient to establish constructive discharge courts look at factors such as whether the threats of termination were repeated, direct, or involved additional adverse conduct. *See, e.g.*, *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 270 (E.D.N.Y. 2012) (finding no constructive discharge where employee merely heard a rumor that supervisor wanted him terminated); *McCalla v. SUNY Downstate Med. Ctr.*, No. 03-CV-2633, 2006 WL 1662635, at *5 (E.D.N.Y. June 8, 2006) (finding that plaintiff successfully pled an adverse employment action where defendants presented plaintiff with a resignation letter and told him if he did not sign it, he would be fired and his career would be ruined); *Grey*, 304 F. Supp. 2d at 324 (noting that a variety of circumstances made the employee's situation "intolerable," including: the repeated threat that her position would be eliminated; a rumored letter announcing her termination; petty reprimands; and suggestion that

the District buyback her contract and subsequent comment that she should consider herself "finished"); *Valdes*, 1997 WL 666279, at *3 ("plaintiff's allegation that his supervisors told him that 'it was best if [he] resigned' because he 'was going to be terminated' creates a triable issue of fact on the question of whether a constructive discharge occurred" (citation omitted)); *Rupert v. City of Rochester, Dep't of Env. Servs.*, 701 F. Supp. 2d 430, 440 (W.D.N.Y. 2010) ("A triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired.").

Plaintiff argues that he was told to immediately sign the resignation letters presented to him, otherwise he would be arrested and prosecuted, would never work again and would lose his benefits. (Fotopolous Aff. ¶¶ 25–26.) Defendants contend that Plaintiff was not coerced to resign, but that he chose to resign in the face of evidence that would have entitled Defendants to fire him. (Def. Mem. 8.) However, weighing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff was faced with more than the mere possibility of discipline or rumors of termination, and that he resigned because of the threat of termination, arrest and/or prosecution. Plaintiff testified that he was told "to sign the resignation letters or lose everything, including any of [his] benefits and . . . [his] ability to ever get another job again," and that "if [Plaintiff] did not sign the papers that [he] would be arrested, they would ruin [his] life and [he] would never get another job again." (Fotopolous Aff. ¶¶ 25–26.) A reasonable jury could find that Plaintiff was faced with a direct threat and was given the choice to resign or be fired or worse. Therefore, the Court finds that a reasonable jury could conclude that Plaintiff was constructively discharged, satisfying the adverse action requirement for his First Amendment retaliation claim.

### iii.    Causal connection

Plaintiff argues that he was suspended and coerced into resigning because "he did not associate with a specific political faction within the Fire District."  (Pl. Opp'n 1.)  He argues that the causal "prong is met because Fotopoulos [sic] established a causal relationship between his membership of the losing political group and refusal to support Commissioner Lang and Chief Korona's faction and Defendants' suspension and subsequent termination of his employment." (*Id.* at 10.)  However, Plaintiff has failed to show that the adverse actions taken against him were *because* he engaged in protected speech or associational conduct.

"To establish causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action."  *Cioffi*, 444 F.3d at 167 (citation and internal quotation marks omitted); *see also Monz*, 519 F. App'x at 726.  "A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus."  *Wrobel*, 692 F.3d at 32 (citation omitted); *see also Catanzaro v. City of New York*, 486 F. App'x 899, 902 (2d Cir. 2012) ("Where a plaintiff has not alleged a specific connection between protected speech and an adverse action, 'causality can be shown through a close temporal proximity between the employer's awareness of protected conduct and the adverse action.'" (quoting *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011))); *Monz*, 853 F. Supp. 2d at 288 (holding that a plaintiff can establish a causal connection that suggests retaliation by showing that the protected activity was close in time to the adverse action, and "[t]here is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship,' and a court must 'exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of each particular case'" (alterations omitted) (quoting

*Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001) and *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009))).  However, a plaintiff cannot solely "rely on conclusory assertions of retaliatory motive to satisfy the causal link."  *Cobb*, 363 F.3d at 108 (citation and internal quotation marks omitted); *see also Whitfield v. Imperatrice*, 477 F. App'x 806, 809 (2d Cir. 2012) (finding causal connection not demonstrated for purposes of First Amendment retaliation claim where plaintiff relied "solely on his own speculation, which is insufficient to defeat a summary judgment motion" (citing *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002))).

Even assuming *arguendo* that Plaintiff actually spoke out about underage drinking in the firehouse, and thus engaged in protected speech in 2009, Plaintiff was not suspended or constructively discharged until January 2011, over a year after his alleged speech.  Plaintiff has failed to offer any evidence that demonstrates that his 2011 suspension and discharge were substantially motivated by his purported 2009 speech against underage drinking.  *See Cioffi*, 444 F.3d at 167 ("To establish causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." (citation and internal quotation marks omitted)); *Wrobel*, 692 F.3d at 32 ("A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus." (citation omitted)).

In addition, the extended time-span between Plaintiff's alleged speech about underage drinking and his suspension and discharge fails to support an inference of retaliation based on temporal proximity.  The Second Circuit "has not identified an outer limit beyond which a temporal relationship is too attenuated to support a finding of causality," and district courts must "exercise our judgment about the permissible inferences that can be drawn from temporal

proximity in the context of particular cases." *Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) (alteration, citations, and internal quotation marks omitted). Here, the span of one year between Plaintiff's protected conduct and the adverse actions taken against him is too attenuated to support an inference of retaliation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting, in Title VII retaliation context, that temporal proximity must be "very close" to be sufficient evidence of causality); *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009) (holding, in Title VII retaliation context, that "where the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established"); *Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007) (holding, in Title VII retaliation context, that span of "almost one year" between complaint of discrimination and subsequent termination "undermin[ed] any causal nexus based on temporal proximity"); *Burkybile*, 411 F.3d at 314 (holding, in First Amendment retaliation context, that the passage of "more than a year" between protected activity and adverse action, combined with other factors, defeated any showing of causation). Plaintiff cannot rely on conclusory assertions of retaliatory motive to satisfy the causal link. *Cobb*, 363 F.3d at 108. Plaintiff has failed to show a causal connection between the alleged protected speech he engaged in and the adverse actions taken against him, and therefore his First Amendment retaliation claim fails.

### c. Section 1985 conspiracy claim

Plaintiff asserts that the Defendants conspired to violate Plaintiff's constitutionally protected rights and retaliate against Plaintiff for refusing to associate with the "powerful political group in the Fire District." (Pl. Opp'n 25.) To make out a claim for conspiracy pursuant to § 1985, "the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for

the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013) (quoting *United Bhd. of Carpenters v. Scott* ("*Scott*"), 463 U.S. 825, 828–29 (1983)); *see also Bhatia v. Yale Sch. of Med.*, 347 F. App'x 663, 665 (2d Cir. 2009) (same); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (same); *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006) (same). "A plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Id.* (alteration omitted) (quoting *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003)). "Furthermore, the 'conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Id.* (quoting *Britt*, 457 F.3d at 269 n.4); *Reynolds v. Barrett*, 685 F.3d 193, 201–02 (2d Cir. 2012) (Section 1985 and 1986 claims require "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.").

Although it is unclear whether under Second Circuit law a political party is a protected group satisfying § 1985's class-based discrimination requirement, the Second Circuit has clearly stated that a plaintiff who claims discrimination because he or she stood "in political and philosophical opposition to the defendants" and were "outspoken in their criticism of the defendants' political and governmental attitudes and activities do not constitute a cognizable class under Section 1985."[9] *Gleason v. McBride*, 869 F.2d 688, 695 (2d Cir. 1989) (alterations,

---

[9] The Second Circuit had previously held in *Keating v. Carey*, 706 F.2d 377, 386–88 (2d Cir. 1983), that political parties are protected groups under § 1985. However, in a case decided after *Keating*, the Supreme Court in *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 836–37

citations and internal quotation marks omitted).  In *Gleason*, the plaintiff had run unsuccessfully as an independent write-in candidate for mayor, and claimed that the defendants conspired to discriminate and did discriminate against him for political reasons.  *Id.* at 694.  The Second Circuit declined to decide the issue concerning political parties, because the plaintiff had not claimed discrimination based on his political party affiliation but rather "alleged only that he was discriminated against because he was a political opponent of the defendants and was extremely vocal in his opposition to their management of the Village."  *Id.* at 695.  The Second Circuit held that the plaintiff had not met his burden to show that he was a "member of a protected class under § 1985."  *Gleason*, 869 F.2d at 695; *see also Arteta v. Cnty. of Orange*, 141 F. App'x 3, 8 (2d Cir. 2005) (affirming district court's dismissal of plaintiffs' § 1985 conspiracy claim because "a plaintiff who does not claim discrimination based on his political party affiliation but rather contends that he was discriminated against because he was a political opponent of the defendants is not a member of a protected class under § 1985" (citing *Gleason*, 869 F.2d at 694–96)).  As the Supreme Court has stated, the term "class" for purposes of § 1985 "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors."  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993).

Plaintiff's claim is foreclosed by the Second Circuit's decision in *Gleason*.  Plaintiff argues that he is a member of a protected class because he was "a government employee who . . .

---

(1983), suggested that unless the discrimination was based on racial animus, the scope of § 1985 might not extend to include discrimination against political groups.  After the decision in *Scott*, the Fourth Circuit in *Harrison v. KVAT Food Management, Inc.*, 766 F.2d 155, 161–62 (4th Cir. 1985), declined to follow the Second Circuit's decision in *Keating*, and held instead that Republicans as a class are not protected by § 1985.  In *Gleason v. McBride*, 869 F.2d 688 (2d Cir. 1989), the Second Circuit was asked to reconsider the question of whether membership in a political party constitutes a basis for protection under § 1985.

refused to associate with the powerful political group in the Fire District structure, the Chief's group . . . ." (Pl. Opp'n 25.) Plaintiff also alleges that "he is part of a protected class because he is a member of Company 8's group and that group refused to associate with the Chief's group." (*Id.*) Even assuming Plaintiff's contention to be true, his alleged protected class falls squarely within the ambit of *Gleason*, and thus does not qualify as a protected class for purposes of § 1985 liability. *See Gleason*, 869 F.2d at 695; *Arteta*, 141 F. App'x at 8 (affirming district court's dismissal of plaintiffs' § 1985 conspiracy claim because "a plaintiff who does not claim discrimination based on his political party affiliation but rather contends that he was discriminated against because he was a political opponent of the defendants is not a member of a protected class under § 1985" (citing *Gleason*, 869 F.2d at 694–96)); *Rzayeva v. United States*, 492 F. Supp. 2d 60, 82 (D. Conn. 2007) ("Membership in non-racial, political classes generally cannot serve as a basis for § 1985 claims." (citing *Scott*, 463 U.S. at 836 and *Gleason*, 869 F.2d at 695)). Plaintiff's § 1985 conspiracy claim is therefore dismissed.

### d. Section 1986 conspiracy claim

Plaintiff argues that the Defendants "neglected, refused, or failed to prevent" the conspiracy to deprive him of his rights, in violation of § 1986, (Pl. Opp'n 27), when the Board failed to accept Plaintiff's rescission of his resignation, (*id.* at 26). Section 1986 provides a cause of action for negligent failure to prevent a § 1985 conspiracy. Section 1985 liability is a necessary predicate to § 1986 liability, and because Plaintiff has not established a § 1985 conspiracy claim, the Court dismisses Plaintiff's § 1986 claim. *See Traylor v. Steward*, 486 F. App'x 948, 949 (2d Cir. 2012) ("Because his § 1985 claim fails, so too does his claim under 42 U.S.C. § 1986." (citing *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000))); *White v. St. Joseph's Hosp.*, 369 F. App'x 225, 226 (2d Cir. 2010) ("Insofar as [plaintiff] sought to state a

claim under 42 U.S.C. § 1986, this claim necessarily failed because she failed to state a claim

under § 1985." (citation omitted)); *Brown*, 221 F.3d at 341 ("[A] § 1986 claim must be

predicated on a valid § 1985 claim . . . ." (citation omitted)); *Gagliardi v. Village of Pawling,* 18

F.3d 188, 194 (2d Cir. 1994) ("Since [plaintiffs] have failed to state a claim for relief under

section 1985, they cannot establish a violation of section 1986 and, therefore, this claim properly

was dismissed."); *Allen v. Cnty. of Nassau*, No. 09-CV-1520, 2013 WL 6795732, at *3

(E.D.N.Y. Dec. 23, 2013) (dismissing § 1986 claim along with § 1985 claim because "[s]ection

1985 liability is a necessary predicate to a Section 1986 claim" (citing *Brown*, 221 F.3d at 341

and *Posr v. Court Officer Shield #207*, 180 F.3d 409, 419 (2d Cir. 1999)); *Foster v. Diop*,

No. 11-CV-4731, 2013 WL 1339408, at *14 (E.D.N.Y. Mar. 31, 2013) ("Because plaintiff has

failed to state a § 1985 conspiracy claim, his derivative § 1986 claim necessarily fails as well."

(citations omitted)).

Plaintiff's § 1986 claim also fails because § 1986, like § 1985, requires "some racial, or

perhaps otherwise class-based invidiously discriminatory animus behind the conspirators'

action." *Reynolds*, 685 F.3d at 201–02. As discussed above, Plaintiff's membership in

Company 8 which "refused to associate with the Chief's group," (Pl. Opp'n 25), is not a

protected class for purposes of § 1985 or § 1986. *See Gleason*, 869 F.2d at 695; *Arteta*, 141 F.

App'x at 8.

### e. Procedural due process claim

At oral argument the Court dismissed Plaintiff's procedural due process claim. The

Court explains its decision here. Plaintiff claims that as a public employee, Defendants' failure

to provide him with a pre-termination hearing deprived him of due process. (*See* Pl. Opp'n 22–

23.) However, as Plaintiff's counsel admitted at oral argument, because Plaintiff could have

commenced an Article 78 proceeding to challenge his coerced resignation, Plaintiff cannot establish a procedural due process claim.

While a public employee with a property right in his job is normally entitled to a pre-termination hearing, it is impractical for employees who are constructively discharged to obtain a pre-termination hearing, and the availability of an Article 78 proceeding subsequent to termination provides adequate procedural due process.  *See Hoover v. Cnty. of Broome*, 340 F. App'x 708, 711 (2d Cir. 2009) (finding the plaintiff "would not be entitled to a pre-deprivation remedy for the constructive discharge," and "[h]aving failed to utilize the adequate post-deprivation remedy of an Article 78 proceeding," the plaintiff's due process claim was "without merit"); *Stenson v. Kerlikowske*, 205 F.3d 1324, 2000 WL 254048, at *1 (2d Cir. Mar. 3, 2000) (unpublished) ("However, since Stenson alleges that he was coerced into resigning, the underlying deprivation was sufficiently unforeseeable that the availability of an Article 78 proceeding provided Stenson with 'a meaningful opportunity to challenge the voluntariness of his resignation' sufficient to ensure due process." (quoting *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984)); *Giglio*, 732 F.2d at 1135 (finding pre-deprivation hearing would have been impractical where the plaintiff claimed he was coerced to resign, and the right to a post-deprivation Article 78 hearing satisfied the State's constitutional obligations); *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, No. 12-CV-0397, 2013 WL 4774484, at *12 (N.D.N.Y. Sept. 4, 2013) ("While a public employee with a property right in her job is normally entitled to a pre-termination hearing, employees who are constructively discharged are not.  As long as a meaningful post-resignation hearing is available, a constructively discharged employee has received constitutionally adequate process.  A hearing under N.Y. C.P.L.R. § 7801 *et seq.* ('Article 78 hearing') is meaningful.  Thus, if Plaintiff could have initiated an Article 78

proceeding, she has not been denied due process." (citations omitted)); *Kruggel v. Town of Arietta*, No. 11-CV-1250, 2013 WL 5304184, at *4 (N.D.N.Y. Sept. 19, 2013) (holding that "availability of an Article 78 proceeding after the fact provides all the process that is due," particularly where "a plaintiff claims that her resignation was coerced, because the voluntariness of a resignation cannot be determined in advance" (citations omitted)); *McGann v. City of New York*, No. 12-CV-5746, 2013 WL 1234928, at *8 (S.D.N.Y. Mar. 27, 2013) (finding pre-deprivation hearing "impractical" because "when an employee resigns, the only possible dispute is whether the resignation was voluntary or involuntary, and this cannot be determined in advance," and therefore the plaintiff was not denied due process where his "post-deprivation Article 78 rights were meaningful" and he "failed to avail himself of them" (alteration omitted)); *Fortunato v. Liebowitz*, No. 10-CV-02681, 2012 WL 6628028, at *4 (S.D.N.Y. Dec. 20, 2012) (noting that "lack of a hearing *before* a plaintiffs' resignation . . . does not deprive the plaintiff of procedural due process because New York provides an opportunity for a post-deprivation hearing" (citing *Giglio*, 732 F.2d at 1134–35)). Thus, because Plaintiff could have challenged his constructive discharge by commencing an Article 78 proceeding, the Court dismissed Plaintiff's procedural due process claim.

### f. Municipal liability claim

Plaintiff argues that Defendants are liable as municipalities because even a single unlawful discharge can support a claim if ordered by a person who is an official policymaker. (Pl. Opp'n 20.) Plaintiff argues that "Commissioner Lang, Chief Korona and Superintendent Sullivan's actions undoubtedly represent government policy because Commissioner Lang, as one of the Board Members, Thomas Sullivan as the District Superintendent and Chief Korona, have final authority over hiring and firing decisions, which are discretionary matters and their

decisions in this area constitute the municipality's final actions." (Pl. Opp'n 21.) At oral argument, Plaintiff conceded that Lang, Korona and Sullivan do not have the power to hire or fire Plaintiff, but argued that because of their titles and positions, they are high-ranking officials and policymakers and their actions therefore subject Defendants to liability. Plaintiff further argues that Defendants are liable because the Board refused to either decline to accept Plaintiff's resignation or to accept Plaintiff's rescission of his resignation. Defendants argue that Plaintiff has failed to identify an officially adopted policy, custom or practice to support municipal liability. (Def. Mem. 12–13; Def. Reply 6–7.)

The dismissal of Plaintiff's underlying claim for First Amendment retaliation requires dismissal of Plaintiff's municipal liability claim, as Defendants cannot be liable where there is no underlying constitutional violation. *Johnson v. City of New York*, --- F. App'x ---, ---, 2014 WL 223432, at *1 (2d Cir. Jan. 22, 2014) ("Because [plaintiff] has not alleged a valid underlying constitutional deprivation, his claim against New York City pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), must also fail." (citation omitted)); *Kajoshaj v. New York City Dep't of Educ.*, --- F. App'x ---, ---, 2013 WL 5614113, at *4 (2d Cir. Oct. 15, 2013) (affirming dismissal of the plaintiffs' *Monell* claim against the municipal defendant because plaintiff failed to plausibly plead a constitutional violation by the municipality's employees); *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("Unless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable."); *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to

an independent constitutional violation."); *Mendoza v. County of Nassau,* No. 11–CV–02487, 2012 WL 4490539, at \*7 (E.D.N.Y. Sept. 27, 2012) ("When there is no underlying constitutional violation, there can be no municipal liability under *Monell.*").

Even if Plaintiff had a viable underlying First Amendment claim, in order to sustain a claim for relief pursuant to § 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right. *Monell v. Dep't of Social Servs. of City of New York.*, 436 U.S. 658, 694–95 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."); *see Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) ("[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (alteration in original) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007))).

A plaintiff may also establish municipal liability premised on the acts of a municipal policymaker with final policymaking authority. "In order to prevail against a municipality based on the acts of a public official, a § 1983 plaintiff must prove, *inter alia*, that the constitutional injury was caused 'pursuant to official municipal policy of some nature,' or by a municipal policymaker with 'final policymaking power' over the challenged action." *Massena v. Bronstein*, --- Fed. App'x ---, ---, 2013 WL 6067505, at \*1 (2d Cir. Nov. 19, 2013) (citations omitted) (quoting *Monell*, 436 U.S. at 691 and *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)); *see also Hines v. Albany Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) ("'[W]here

action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly'; municipal liability, however, 'attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" (alteration in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)); *Schwab v. Smalls*, 435 F. App'x 37, 40 (2d Cir. 2011) (plaintiff failed to sufficiently plead *Monell* liability where she did "not adequately allege[] that any of the individual defendants had final authority to establish municipal policy with respect to the hiring and firing of District employees" (citation and internal quotation marks omitted)); *Zherka v. DiFiore*, 412 F. App'x 345, 348–49 (2d Cir. 2011) ("[S]ection 1983 liability can only attach where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. That is, a 'policy' giving rise to liability cannot be established merely by identifying a policymaker's conduct that is properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (citations and internal quotation marks omitted)); *Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." (citations omitted)). "The question of whether an official has final policymaking authority is a question of law." *Id.* (citing *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000)).

For purposes of municipal liability, it is not enough that Lang, Korona and Sullivan are high-ranking officials within the District as Plaintiff contends. Plaintiff concedes that Lang, Korona and Sullivan do not have final authority over hiring and firing policy, and Plaintiff has provided no evidence that Lang, Korona and Sullivan had policymaking authority over suspensions. Because they do not have this authority, Lang, Korona and Sullivan are not final policymakers in this area, and as such, their actions of suspending Plaintiff or forcing or coercing Plaintiff's resignation cannot subject Defendants, as municipal entities, to liability. *See Massena*, --- Fed. App'x at ---, 2013 WL 6067505, at *1 (stating that municipal liability lies where the constitutional injury is caused "by a municipal policymaker with 'final policymaking power' over the challenged action," and affirming dismissal of municipal liability claim where the city official responsible for administering the plaintiff's contract but not responsible for awarding contracts could not impose liability on the City for non-renewal of the contract (citation omitted)); *Schwab*, 435 F. App'x at 40 (finding plaintiff high school employee failed to sufficiently plead municipal liability premised on acts of the District Superintendent of Schools, the high school principal, and another employee where she did "not adequately allege[] that any of the individual defendants had final authority to establish municipal policy with respect to the hiring and firing of District employees" (citation and internal quotation marks omitted)); *see also Zherka*, 412 F. App'x at 348–49 ("[S]ection 1983 liability can only attach where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." (citations and internal quotation marks omitted)). Because Lang, Korona and Sullivan are not policymakers capable of subjecting Defendants to liability for Plaintiff's suspension and discharge, to prevail against Defendants based upon their acts, Plaintiff would have to show that

his injury was caused pursuant to a municipal policy, and Plaintiff has not presented any such evidence. *See Massena*, --- Fed. App'x at ---, 2013 WL 6067505, at *1 ("In order to prevail against a municipality based on the acts of a public official, a § 1983 plaintiff must prove, *inter alia*, that the constitutional injury was caused pursuant to official municipal policy of some nature, or by a municipal policymaker with final policymaking power over the challenged action." (citations and internal quotation marks omitted)).

To the extent that Plaintiff argues that the Board, as the body vested with discretion over hiring and firing, participated in his alleged injury either by failing to decline Plaintiff's resignation or by failing to accept Plaintiff's rescission of his resignation, Plaintiff has not demonstrated that this action by the Board was retaliatory in nature. Plaintiff has not shown any causal connection between his alleged protected activity — his speech about underage drinking in the firehouse sometime in 2009, his opposition to Lang in the December 2009 election, and his refusal to hold a second Company 8 officer election in January 2011 — and the actions of the Board. *See Nagle v. Marron*, 663 F.3d 100, 109 (2d Cir. 2011) (plaintiff must show the protected speech was a substantial motivating factor in the adverse employment action (citing *Cioffi*, 444 F.3d at 167)); *Cioffi*, 444 F.3d at 167 (same). Plaintiff's municipal liability claim therefore fails.

### g. State law claim

Because the Court dismisses all of Plaintiff's federal claims, the Court declines to exercise jurisdiction over Plaintiff's sole remaining state law claim pursuant to New York Civil Service Law § 75. "District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before

trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citations and internal quotation marks omitted); *see also One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims"); *Sullivan v. City of New York*, No. 10-CV-0038, 2011 WL 3806006, at *6 (S.D.N.Y. Aug. 29, 2011) ("where federal claims are dismissed before trial, the state [claims] should be dismissed as well." (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998))). The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim of violation of the New York Civil Service Law § 75. Plaintiff's state law claim is therefore dismissed without prejudice.

### III. Conclusion

The Court grants Defendants' motion for summary judgment as to all of Plaintiff's federal claims. The Court declines to exercise jurisdiction over Plaintiff's remaining state law claim for violation of the New York State Civil Service Law and that claim is dismissed without prejudice. The Clerk of the Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2014
         Brooklyn, New York